## Case No. 11,444.

### In re PROTECTION LIFE INS. CO.

[9 Biss. 188; 9 Ins. Law J. 145; 9 Reporter, 199; 12 Chi. Leg. News, 144.] [1]

Circuit Court, N. D. Illinois.   Dec., 1879.

INSURANCE POLICY — CONTRIBUTORY PLAN — CONSTRUCTION — ASSESSMENT UPON POLICY HOLDERS — MONTHLY ASSESSMENTS — FAILURE TO MAKE — POWER OF COURT TO MAKE ASSESSMENTS — ASSETS.

1. If a policy of insurance is sui generis and not provided for either in the general laws of the state regulating insurance, or in the special charter of the company, the obligations of the company and the policy holders to each other, must be found wholly in the terms of the contract.

2. The policies of a life insurance company provided that the means for paying the death losses were to come from assessments upon the other policy holders, who were such at the time of the assessment, but the policy holders when assessed were at liberty to pay or not as they elected: *Held*, that an assessment under these policies would not authorize the company to bring suit in case of failure to pay and that the court cannot confer such a right on the assignee of the company by an assessment on the policy holders.

3. And where the policies provided that the assessments were to be made monthly on all policy holders who had made timely payment of the last assessment: *Held*, that the failure of the company to make the assessments regularly from month to month as provided could not be retrieved by an assessment by the court.

4. The fact that death losses had accrued against the company for which assessments should have been made, but which the company neglected to make, prior to the institution of proceeding, by the auditor of the state, to wind up the company, does not authorize the court to exercise the functions of the company by making these assessments.

5. Under these policies the amount to be assessed is not an asset of the company and its general creditors have no right to it.

In bankruptcy.

Leonard Swett, H. D. Beam, E. B. Sherman, and John Gibbons, for assignee.

Ira O. Wilkinson, Wallace & Mason, Elliott Anthony, J. C. Richberg, and C. C. Carstens, for respondents.

BLODGETT, District Judge.   This is an application by the assignee of the bankrupt, the Protection Life Insurance Company, for an assessment upon the policy holders, which it is claimed the company should have made, but neglected to make, prior to the institution of winding-up proceedings by the auditor of this state.

The material facts bearing upon the application seem to be these:   The original charter granted the company by the general assembly of Illinois in March, 1867, authorized it to do a life insurance business as a mutual company, all policy holders becoming members and being entitled to a vote and a voice in its management, and to participate in its profits.   By an amendment to the charter

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.   9 Reporter, 199, contains only a partial report.]

made in 1869, the company was authorized to insure lives on the non-participating plan, and to transact the business of the company, on the joint stock or mutual principle, or both, and authorized a capital stock of $100,000, to be divided into shares of $100 each, which stock was to be issued to the owners of the guarantee capital theretofore issued by the company, and the company was empowered to declare such dividends to the stockholders as its trustees should deem advisable.

Some time in 1871, the company commenced to issue policies upon a plan not indicated in its charter or its amendment, called the "contributory plan."   The substantial features of this plan were that each policy holder was to pay to the company, on the death of the holder of a policy in force, a sum fixed or provided for in the policy, and the money thus collected by the company was to be paid over to the person or persons to whom such death-loss was payable.   A small sum as a membership fee was to be paid to the company.   The company was to make the assessment on the death of a policy holder, and give notice thereof in the manner provided by the terms of the policy, and a failure or refusal to pay such assessment was to forfeit all rights of the person so assessed under his policy.   The plan cannot be called a "mutual plan," within the meaning of the original charter, because the policy holders had no voice in the management of the business and had no interest in the profits of the company.

During the time the company transacted business, several forms of policies were used, which are referred to as policy No. 1, policy No. 2, policy "A," policy "B," policy "BB," and policy "BB 2," and "Commercial League."   The assignee states that the policy holders to be affected by the proposed assessment, are as follows:

| | | | | | |
|---|---|---|---|---|---|
| Holders of old "A" | policies, about | | | | 2,000 |
| " | " | "A" | " | " | 5,000 |
| " | " | "B" | " | " | 6,000 |
| " | " | "BB" | " | " | 3,000 |

I shall therefore consider only the liability to assessment of the holders of these policies, and this liability must be found, if at all, solely in the contract or policy itself, because this kind of contract of insurance is sui generis, and not provided for either in the general laws of this state regulating insurance, or in the special charter of the company.   The obligations of the company and policy holders to each other must be found wholly in the terms of the contract.   The terms of the forms "A" and "B," do not essentially differ.   I read from the "B" policy the terms upon which it is issued, which are as follows: "The Protection Life Insurance Company of Chicago, in consideration of the representations and agreements made in the application therefor, and the sum of $14 for membership fee, and a deposit equal to ten assessments, as hereinafter stated in condition one of this policy, for payment of death losses in advance of collection of assessments, amounting

to $—— and of the further sum of $4 to be paid oh the —— day of —— in each year hereafter, for expenses, does hereby issue this policy to —— of —— county of —— and state of —— with the following agreements: Upon the death of the said ——, he having conformed to all the conditions hereof, and on satisfactory proof of said death being filed with the secretary of the said company, an assessment shall be made upon all the policy holders of the company at the time of the assessment, according to the policy then held by each, for as many dollars as there are policy holders in the company whenever the number of policy holders does not exceed twenty-five hundred, and whenever the number of policy holders is more than twenty-five hundred, then the assessment shall be for an amount in proportion to the membership of the company, not exceeding the limit of this policy, in the ratio of one dollar for each $5,000 policy holder, and such a proportional part of one dollar for each $2,500 policy holder as $2,500 is of the total number of policy holders in the company, and the sum collected on such assessment, less the added cost of collection, shall be paid to ——, or his legal representatives, at the office of the company, in Chicago, within ninety days from the time of acceptance of said proof of death, provided, however, that in no case shall the payment upon this policy exceed $2,500, and in case any of said policy holders who shall have paid all dues and previous assessments refuse or neglect to pay the assessment made upon them on this policy, the company agrees to pay the said defaulted assessment. And it is further agreed that the company guarantees the payment of at least $1,000 upon this policy, if in force, in case of the death of the said insured within one year from the date hereof. And the application of such further sums thereon in excess of the $1,000 above guaranteed as may be collected by assessment, as hereinbefore stated, from the policy holders, not exceeding the sum of $2,500."

Condition 2 of this policy provides for the manner in which the assessment shall be made and notice thereof given, and the time within which it shall be paid; and provides for a forfeiture of the policy in case the payment is not made within the time required. I will here say, in regard to this condition, that it is but a statement in detail of the manner in which the company is to proceed to collect the assessment, and provides that the assessments shall be made monthly for the death-losses of the preceding month; and notice shall be given through the mail to the parties assessed, who shall have until the fifth day of the next ensuing month in which to make payment, and if they do not make payment within that time their policies are to be forfeited. And it specially provides that estimates for monthly assessments are to be based on the number making timely payment of the last assessment, and will include all claims proven and accepted prior to the making of such assessment, and not previously assessed.

It will be seen from a study of these policies that two leading principles run through them all.

First—That the means for paying a death-loss were to come from assessments upon the other policy holders. The company had no treasury or fund to meet these losses, but the policy holders were each to contribute, if they deemed it for their interests to do so, and the contributions so collected were to be paid the beneficiary of the death-loss.

Second—A policy holder when assessed was at liberty to pay or not as he elected. The assessment was to be made upon "the policy holders at the time of the assessment," thus showing that those who had defaulted on previous assessments and thus lapsed out, were not to be treated as liable to assessment.

For the purposes of the business contemplated by this plan, the company was a mere machine to take proof of death-losses, make assessments and pay over the money contributed to the party entitled thereto. By the "A" and "B" forms of policy the company guaranteed the collection of at least one thousand dollars on the assessments, and also agreed, in case any of said policy holders who had paid all previous dues and assessments, should refuse or neglect to pay the assessments made on them, to pay the defaulted assessments; but I presume it will hardly be claimed that this guaranty gives the company a right of assessment—certainly not until the company has fulfilled its guaranty. Aside from these guarantees the "A" and "B" policies create no obligation on the part of the company save to make an assessment and pay over what is received upon it.

An assessment under these two forms of policy does not make the policy holders debtors to the company, so as to authorize the company to bring a suit in case of neglect or refusal to pay an assessment, and it is very clear to me that if the company could not obtain a right of action by making an assessment, as provided in the policies in case of a death-loss, the court cannot confer such a right on the assignee by an assessment on the policy holders. If the company could not coerce payment, I do not see what power of the court can be invoked to aid the assignee in the premises. The whole organization seems to have been purely voluntary.

It is claimed on the part of the petitioner that the terms of the application and the condition of the policy, when taken together, make out a promise by the policy holder to pay his assessments: but when the whole of the "A" and "B" policies are taken and construed together, I think it very plain that the company did not intend to assume any obligation to the holder of a death-loss beyond its undertaking to assess and its guarantees.

The "B B" policy reads as follows: "The

Protection Life Insurance Company, in consideration of the representations and agreements made in an application therefor, and of the membership fee paid, and of an advance premium for the payment of all death-losses and costs of collection for one full year from the date hereof, to be paid and used as in condition 2 of the policy, does hereby insure the life of ——, in the sum of ——, for the term of one year from the date hereof."

Condition 2 provided for the payment of a fixed amount of cash to the company at the time of the issue of the policy sufficient to meet all assessments for death-losses during the year, or for giving a premium note payable on demand, to be used on the payment of the policy; and the cash paid to the company or the premium note was to be apportioned in payment of death-losses and expenses, as follows: "On the death of each policy holder in said company the said insured agrees to pay, in common with all contributing members thereto, according to the age and amount of insurance in each, as shown in said company's schedule of assessment rates (printed on the back hereof,) his or her proportion of the loss; and for all such death-losses in monthly groupings or payments, as hereinafter described, and ten (10) cents to cover the costs of collection. The estimate for assessments to pay death-losses are to be made monthly, on the basis of the number that made timely payments on the last assessment, and will include all claims proven and accepted prior to the making of such estimate and not previously assessed for; and printed notices, giving the name and residence of each deceased member, the amount of his or her insurance, the names of parties joining in the proofs of death, and the amount of assessment therefor, will be dated and sent (as hereinafter stated) to said party insured, or to his or her legal representative, on or about the sixth day of the month thereafter: and the full amount of all monthly assessments is to be paid by the said party insured from and after the date of this policy, and so long as the same remains in force. If the premium of the said party insured consists of current funds (or of a sufficient amount of advanced money,) the notices of assessment will be receipted before being sent, and their amount will be taken from the moneys held by the company; but if the premium consists of a note made payable to said company on demand, the mailing of each assessment notice to the said party insured, or to his or her legal representative, shall be considered and held as a proper and legal demand for the payment of at least that amount of said note; and it shall be the duty of said party insured or his or her legal representative, to pay the amount thus demanded, enclosing the assessment notice with the remittance, at the home office of the company, in Chicago, on or before the fifth (5) day of the next month, after the printed date of such assessment notice; then on receipt thereof, said company will mark the assessment notice 'paid,' and forward it (in manner provided in condition 4) to the said party insured, to his or her legal representative, and all such payments of assessments are hereby acknowledged by said company as payment on the annual premium note of the said party insured. But, if any such monthly assessment is not paid within the time and in the manner above specified, then this policy shall be null and void, and no person shall be entitled to damages, or the recovery of any moneys paid for insurance while the policy was in force; nor shall the said premium note be nullified or impaired in legal and binding force, until the defaulted monthly assessment and all damages and costs of collection and expenses attending are paid, and this policy is returned to said company for cancellation. If the said party insured shall at any time during his or her insurance year pay the last assessment for which he or she was enumerated, and return this policy to said company for cancellation, then the said premium note will be cancelled and returned, and any balance of moneys held will be refunded, without any further lien or claim by said company; and at the end of the insurance year, all monthly assessments being paid to that date, the premium note or any balance of premium money held will be returned by the said company to the said party insured; and any moneys paid on premium notes for quarterly or semiannual payments will be endorsed by the company on such notes and held subject to the same rules of use or return as hereinbefore specified."

The "B B 2" policy does not differ in any material particular, for the purposes of this case, from that of the "B B" form; and the leading provision in both is that a fixed sum is to be paid in advance or secured by a note for the payment of death-losses for a full year, and the sum of money so paid, or the note, is to be assessed monthly for the death-losses which have occurred during the preceding month "on all policy holders who have made timely payment of the last assessment"—of which assessment due notice is to be given; and in case a note is given the assessment must be remitted to the company by the fifth of the next month and a failure to so remit makes the policy null and void, but leaves the person assessed liable on his note for the assessment which he thus neglects to pay.

It will be remembered that the assignee shows to the court, as the reason for this application, that the company neglected to make assessments, and that over sixty death-losses accrued against the company for which assessments should have been made, but which the company neglected to make, and therefore the court is asked to exercise the functions of the company, and make now the assessments which the company should have made from month to month.

It is obvious that no assessment need be made on those who paid their cash into the hands of the company, as an "advanced premium for one year," while as to those who gave notes liable to monthly assessments, it is evident that they had the right to have these assessments made monthly in strict conformity with the terms of the policy, so that they might elect to lapse out if the assessments were too heavy, or for any other reason. In my view, the failure of the company to make the assessments regularly from month to month, cannot now be retrieved by an assessment by the court. The parties by their contract, if it is a contract, had provided a certain agent for the making of these assessments, and the court cannot substitute itself in the place of the agent which the parties agreed upon. Only those are to be assessed for payment of a death-loss who have made timely payment of the preceding assessments, showing beyond doubt that this was the intention of all parties to this association to allow any one who chose to do so, to let his policy lapse on any monthly assessment; and while there are words in condition two of the "B B" and "B B 2" policies, which show that the company might collect one defaulted assessment, yet it is also provided that by so paying he was to have a surrender of his premium note.

The main feature of the plan on which the company started is still substantially retained; that death-losses were to be paid by voluntary contributions of the other policy holders, and in the light of this distinctive feature of the relations between the company and the policy holders I have doubts whether the company can have any legal claim upon policy holders until it had paid the loss for which an assessment is made. The case is widely different from the cases in this court, where assessments have been made by the court on stockholders, for their unpaid stock liable to assessment; and also from the liability of members of a mutual company, to assessments under the terms of their charter.

There seem to me, also, other very cogent reasons why this assessment cannot and should not now be made. This contributory plan, so far as it had the elements of a contract, was based upon the understanding that those who paid assessments did so with the expectation that their policies would be paid when a death-loss thereon accrued; that the company, by its exertions, would keep up its organization and membership so as to give assurance of payment when the contingency occurred which should entitle these persons to demand payment, and I take it that all will concede that no one should be compelled to pay unless he thereby secured to the beneficiary of his policy a right to compel payment. But this company is now dead. All money paid on any assessment which the court might make would be hopelessly lost. It would secure no right to the person paying; and I cannot see what conscionable reason there is for enforcing this assessment. Suppose the company in the exercise of its delegated functions, under any of these policies, had sent out with its notice of an assessment information to the person so assessed that none of their policies would be paid; can it be supposed that payment of an assessment thus demanded would or could be enforced in a court of justice? True, the party in whose favor this last supposed assessment was made, might say all the assessments on his policies had been paid up to the time of the death of the insured, and he had earned the right to have his loss paid, but that answer would hardly satisfy those who had the right to demand an equivalent for their money before parting with it. The dilemma in which the holders of these death-losses find themselves, is one which, it would seem, might well have been anticipated when they became parties to a scheme like this. It was an experiment, and depended for its success entirely on keeping up the confidence of the policy holders in each other and the company to such an extent as to keep the classes of insured liable to contribute, full by new members being induced to join as fast as old ones lapsed or died out.

But the main and insuperable objection in my mind to making this assessment is, that under all the policies on principle, and under most of them by their terms, the amount to be assessed is not an asset of the company. It is so much money which each policy holder agrees to contribute to pay a death-loss, and when collected does not belong to the company, nor to its general creditors, but to this special class of creditors, most of whom could only maintain a suit against the company on its guarantees or for damages by reason of its neglect to make the assessment. The money which might be realized would not be general assets but only come to the assignee to be paid over at once to these special creditors; while in cases of assessments upon stockholders and upon members of mutual companies, the money collected becomes a general fund for the payment of all creditors.

The prayer for assessment is therefore denied, and the petition dismissed.